UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   **5/17/2013**

-----------------------------------------------------------x

WILLIAM EPPS,                          :

              Petitioner,            :

    - against -                        :

ROBERT ERCOLE,                     :

            Respondent.         :

-----------------------------------------------------------x

**REPORT AND**
**RECOMMENDATION**
**TO THE HONORABLE**
**RICHARD OWEN**

09 Civ. 4802 (RO) (FM)

**FRANK MAAS,** United States Magistrate Judge.

        Pro se petitioner William Epps ("Epps") brings this habeas corpus

proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction in

Supreme Court, New York County, on one count each of Burglary in the First Degree,

Robbery in the Second Degree, and Assault in the Second Degree, following a trial before

Justice Arlene Goldberg and a jury. Epps was sentenced as a persistent violent felony

offender to three concurrent terms of twenty years to life imprisonment, which he is

currently serving at the Green Haven Correctional Facility.

        In his petition, Epps presses all three claims previously advanced as part of

his direct appeal. (ECF No. 2 ("Petition" or "Pet.")). First, Epps contends that the trial

court violated his constitutional right to due process by failing to suppress certain

identification evidence. (Id. ¶ 13; ECF No. 9 ("Resp't's Decl.") Ex. A (Pet'r's Br. on

Appeal ("Br.")) at 15-28). Second, Epps contends that his due process rights were

violated because a court officer improperly instructed several jurors with respect to

procedural matters.  (Pet. ¶ 13; Br. at 29-33).  Finally, Epps alleges that his conviction

was not supported by the weight of the evidence.  (Pet. ¶ 13; Br. at 35-37).  For the

reasons set forth below, the Petition should be denied.  Additionally, because Epps has

not made the substantial showing of the denial of a constitutional right required by

28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

I.      Background

        A.      People's Case

                The People's proof at trial would have permitted a reasonable juror to find

as follows:

                On January 27, 2004, at approximately 1:20 a.m., Epps attacked and robbed

Lori Young ("Young") in the stairwell and lobby of an apartment building on East 12th

Street between Avenues A and B in Manhattan.  (T1. 301-06, 328).[1]  After Young entered

the building and began walking up the stairs, Epps grabbed her from behind and asked her

for money.  (Id. at 308).  When she refused, Epps punched her in the head several times

and attempted to take her purse.  (Id.).  Young then screamed for help, prompting Josh

Lechner ("Lechner") and Elyse Allen ("Allen"), tenants in an apartment on the third

floor, to enter the staircase in an attempt to help her.  (T2. 155-58, 232-33, 237-38).

Lechner tried to push Epps away from Young while Allen called "911" from her cell

_____

[1]              The transcript of the second and third days of the trial is separately paginated.
Accordingly, "T1." refers to the transcript of the first day.  "T2." refers to the transcript of the
second and third days.  "H." refers to the transcript of the pretrial hearing held on March 1, 2005.
"S." refers to the transcript of Epps' sentencing.

phone.  (T1. 309-10; T2. 158-59, 165).  As Allen was calling, Epps dragged Young down

several flights of stairs to the building's lobby.  (T2. 158-59).  He continued to punch her

as Lechner and Allen looked on, until he succeeded in gaining possession of her purse.

After staring at Lechner and Allen for a few moments, Epps fled east on 12th Street.

(T1. 309; T2. 159, 244-45).

       Lechner and another building resident, David Williams ("Williams"),

chased after Epps.  (T2. 245-48).  At the intersection of 12th Street and Avenue B,

Lechner notified Sergeant Elias Miranda ("Sergeant Miranda"), who was in a parked

police car, that a woman had been robbed and that the perpetrator was fleeing on foot.

Sergeant Miranda and other officers immediately began driving east on 12th Street

toward Avenue C.  (T1. 380-81; T2. 5-8, 21, 140-41, 246-48).  After Williams pointed

toward Epps to indicate that he was the culprit, Sergeant Miranda exited his vehicle and

pursued him on foot.  (T1. 382, 390, 398; T2. 148, 248).  Ignoring Sergeant Miranda's

order to stop, Epps entered a housing project located at 643 East 13th Street, between

Avenues B and C.  (T1. 382-84, 388, 398; T2. 8-10, 142).  Sergeant Miranda followed

Epps into the building and up the stairs, but lost sight of him around the fifth floor, at

which point he heard a door slam.  (T1. 384-86).  Sergeant Miranda and other officers

subsequently canvassed the apartments on the fifth floor but could not find Epps.  (T1.

384-85, 408-12; T2. 13).  Unbeknownst to them, at the time of the incident, Epps resided

in an apartment on the sixth floor of the building.  (Id. at 334).

Later that day, Detective Enrique Rivera ("Detective Rivera"), who was assigned to investigate the case, interviewed Young at the local precinct.  (T2. 46, 48). Young described her attacker as a black male between the ages of twenty-five and thirty-five, approximately six feet tall, with a slim build and short black hair.  (T1. 312-13).  She also indicated that he was wearing a "big blue jacket with a hood" and had "gold teeth fronts."  (Id. at 312).  Young then viewed pictures of hundreds of individuals who matched the description of her attacker, but was unable to identify a suspect.  (Id. at 313-14, 345-48; T2. 50-51).  That same day, Detective Rivera interviewed Lechner and Allen, who both gave similar descriptions of the man who attacked Young, and also looked at hundreds of pictures without identifying a suspect.  (T2. 53-55, 171, 252-54).

The next day, a fellow officer suggested to Detective Rivera that he investigate Edwin Rivera, an individual who lived in a building in the same housing complex as 643 East 13th Street.  (Id. at 82-87, 131-34).  Although Edwin Rivera had more than twenty convictions (mostly misdemeanors), he had never been convicted of a violent felony, nor had he been arrested for robbery, burglary, or assault.  (Id. at 85, 301, 323-24).  Detective Rivera then showed Young a photo array that included a photograph of Edwin Rivera.  (Id. at 87-88).  After viewing the array, Young selected the photograph of Edwin Rivera.  (Id. at 88-91).[2]  Detective Rivera then went to Edwin Rivera's last

---

[2]     According to Detective Rivera, Young stated at the time that she was not positive that Edwin Rivera was her assailant, but was "ninety percent sure."  (T2. 59, 89-91).  Young testified that she selected the photograph of someone who closely resembled her assailant so that Detective Rivera "could have an idea of what he was looking for," even though she "knew it
(continued...)

4

known address, but was advised by the mother of Edwin Rivera's children that he had not lived at that address for at least two years.  (Id. at 91-92, 94-96).

On February 13, 2004, Lechner viewed four photo arrays, which included photographs of Edwin Rivera and Epps – although the photo of Epps was approximately five years old.  Lechner failed to recognize any of the individuals depicted in the photo arrays.  (Id. at 60).

On March 11, 2004, Detective Rivera arrested Epps.  (Id. at 62).  At the time of the arrest, Epps had gold caps on his front teeth, which were seized as evidence. (Id.).  That evening, Young and Lechner viewed Epps in a lineup.  Lechner identified Epps as the man who attacked and robbed Young, but Young was unable to make an identification.  (T2. 68, 69).  On March 26, 2004, after viewing a different lineup, Allen also identified Epps as Young's attacker.  (Id. at 72).

At trial, Lechner and Allen both identified Epps as the man who attacked and robbed Young on January 27, 2004; both also noted that the gold caps that Epps was wearing at the time of his arrest were similar to those that he wore on the night of the attack.  (Id. at 160, 247).  When they were shown a picture of Edwin Rivera, Lechner and Allen both testified that he was not Young's attacker.  (Id. at 173, 256).  Young agreed that Edwin Rivera was not her assailant and, on cross-examination, testified that Epps

----

[2](...continued)
wasn't him."  (T1. 314-15).  She nevertheless conceded that she had told Detective Rivera that she was "about 80, . . . 90 percent sure."  (Id. at 314).

was.  (T1. 315, 357 (indicating that it was Epps' "eyes" that made her "recognize him now more than [she] did before")).

B.    Defense Case

Edwin Rivera was the sole defense witness.  After discussing the tactic with Epps, defense counsel decided to call Edwin Rivera in an effort to show that he was the true assailant.  During his testimony, Edwin Rivera denied any involvement in the Young assault and robbery.  He further testified that he was selling drugs on 12th Street and Avenue A at the time of the incident when he saw a man follow a woman into a building on 12th Street and later saw a man "run out of the building."  (T2. 314-16).  Edwin Rivera further testified that he never had worn gold caps on his teeth.  (Id. at 321).  On cross-examination, Rivera testified that he had informed the police that Epps committed the Young robbery after he was arrested on unrelated charges.  (Id. at 322).

C.    Motion for Mistrial or to Replace Jurors

On Friday, March 4, 2005, after the jury was dismissed for the weekend, three jurors reentered the courtroom.  In Justice Goldberg's absence, one of the jurors asked a court officer whether the next stage of the trial would involve Epps putting on a case.  Epps' counsel – who was still in the courtroom at the time – overheard the court officer say "something to the effect of . . . '[i]f he wants, he goes after the prosecution.'" (Id. at 213-14).  Based on that interchange, Epps' counsel asked Justice Goldberg to conduct an inquiry to determine whether a mistrial was warranted.  (Id. at 214).

6

Outside of the jury's presence, Justice Goldberg first questioned the court officer, who explained that the jurors had asked him whether Epps' counsel would now question witnesses on direct examination with the People cross-examining those witnesses.  According to the officer, he responded, "Yeah, that's the way it goes."  (Id. at 216-17).

Justice Goldberg then questioned each of the three jurors separately.  The first juror acknowledged that the jurors had returned to the courtroom to ask the court officer a "procedural question as to how things would go forward," suggesting that their questions allegedly had "nothing to do with the case."  (Id. at 219-20).  When the Justice asked that juror whether she understood that Epps was under no obligation to present a case, she answered in the affirmative and apologized to the court.  (Id. at 220-21).

The second juror similarly acknowledged that the jurors had asked the court officer a "procedural question," prompted in her case by a concern about her work obligations the following week.  (Id. at 222-23).  That juror also apologized and answered in the affirmative when asked whether she understood that Epps was under no obligation to put on a case.  (Id. at 223-25).

The third juror had accompanied the other two jurors into the courtroom simply because she planned to take the subway home with one of them.  (Id. at 225-27).  She, too, stated that she understood that Epps might or might nor put on a case, and was under no obligation to do so.  (Id. at 227).

Both the prosecutor and Epps' defense counsel declined to ask the jurors any questions.  (Id. at 221, 224, 227-28).  Nevertheless, after the court had completed its inquiries, Epps' counsel moved for a mistrial or, in the alternative, that the court remove those jurors and replace them with alternates.  (Id. at 228-30).  Justice Goldberg denied the motion, finding that there was "nothing about the conversation that occurred with the court officer that in any way tainted [the jurors] or prejudiced them against Epps."  (Id. at 230).  The Justice further noted that whether and when Epps would put on a case in fact presented a "merely procedural" question.  (Id.).

D.      Verdict and Sentence

On March 8, 2005, the jury returned a guilty verdict on all three charges: Burglary in the First Degree, Robbery in the Second Degree, and Assault in the Second Degree.  (Id. at 416).  Thereafter, on April 21, 2005, Justice Goldberg sentenced Epps to three concurrent, indeterminate terms of twenty years to life imprisonment.  (S. 15-16).

E.      Pretrial Hearing

Prior to trial, on March 1, 2005, Justice Goldberg held a combined Wade/Mapp/Dunaway hearing.[3]  (H. 4).  Detective Rivera was the only witness at the hearing.  Detective Rivera testified that he interviewed Young, Lechner, and Allen, shortly after the incident, and each described Young's attacker as a black male between

---

[3]      See Dunaway v. New York, 442 U.S. 200 (1979); United States v. Wade, 388 U.S. 218 (1967); Mapp v. Ohio, 367 U.S. 643 (1961).

the ages of twenty-five and thirty-five, wearing a blue coat and tan boots, who had gold caps on his front teeth. (Id. at 12-22).

Detective Rivera also explained the circumstances leading to Epps' arrest. According to Detective Rivera, on January 28, 2004, a sergeant from the Street Narcotics Enforcement Unit ("SNEU") informed him that one of several individuals arrested as part of a SNEU operation had stated that the man who robbed Young was named "Billy" and frequented a building located next to 643 East 13th Street. (Id. at 17-18).

Detective Rivera then queried a police database and determined that Epps lived on the sixth floor of 643 East 13th Street, fit the description of the man who had robbed Young, and was on parole for a robbery charge. (Id. at 20-22). Detective Rivera contacted Epps' parole officer, who provided him with a picture of Epps which depicted Epps wearing gold caps on his teeth. (Id. at 22-24, 55).

On March 11, 2004, Detective Rivera arrested Epps. (Id. at 24-25, 58-59). At the time of his arrest, Epps was wearing a blue denim jacket and tan boots; he also had gold caps on his teeth. (Id.). During a lineup later that day, Lechner identified Epps, but Young did not. (Id. at 26-27, 60). The lineup consisted of Epps and five "fillers" who generally fit Epps' description. (Id. at 27; see also ECF No. 9 ("Resp't's Decl.") Ex. H (lineup photograph)).

On March 26, 2004, during a second lineup, Allen also identified Epps. (H. 30-32). Epps' counsel was present at that lineup and helped to arrange it. (Id.). The

9

fillers used for that lineup also generally matched Epps' description.  (Id.; see also Resp't's Decl. Ex. I (lineup photograph)).

Justice Goldberg credited Detective Rivera's testimony and made findings of fact consistent with his account.  (H. 74-76).  Based on those findings, the court concluded that Detective Rivera had probable cause to arrest Epps, and that neither of the lineups was unduly suggestive.  (Id. at 76-68).  The court consequently denied Epps' pretrial motion "in all respects."  (Id.).

E.     Direct Appeal

On appeal, Epps was represented by the Benjamin N. Cardozo School of Law Appeals Clinic.  (See Br.).  In his brief to the Appellate Division, First Department, Epps advanced three claims.  First, he argued that the trial court erred by denying his motion to suppress the identification evidence, because several factors that it failed to consider rendered the lineup identifications unduly suggestive.  Specifically, Epps noted that:

(1)     Lechner and Allen had viewed photographs of possible suspects together;

(2)     Lechner had viewed a photo array that included a picture of Epps prior to viewing Epps in a lineup;

(3)     there were alleged physical dissimilarities between Epps and the fillers in the lineups viewed by Lechner and Allen;

(4)     Epps was allowed to wear clothing during the lineups which was similar to the clothing the witnesses said Young's attacker was wearing; and

(5)     after Lechner identified Epps in a lineup, he discussed that lineup with Allen before she made her identification.

(Id. at 16-27).  Second, Epps contended that the discussion between the court officer and the three jurors as to whether Epps would put on a case was presumptively prejudicial, thereby requiring the reversal of his conviction.  (Id. at 29-33).  Third, Epps maintained that his conviction was not supported by the weight of the evidence.  (Id. at 34-35).

On February 19, 2008, the Appellate Division unanimously affirmed Epps' conviction.  See People v. Epps, 851 N.Y.S.2d 507 (1st Dep't 2008).  In its decision, the Appellate Division found that Epps' guilt was established "through reliable identification testimony by two witnesses" and other "corroborating evidence" and, thus, not against the weight of the evidence.  Id. at 507.

Turning to the suppression motion, the court found that in "each of the two lineups, the characteristics of the participants were reasonably similar and any differences were not sufficient to create a substantial likelihood that [Epps] would be singled out for identification."  Id.  The court further concluded that all of Epps' other claims relating to the suggestiveness of the identification procedures were "unpreserved" and declined to review them in the interest of justice.  Id.  "As an alternative holding," the court rejected those claims on the merits because they were "improperly based on trial, rather than hearing, testimony."  Id.  The court further noted that, "even on the basis of trial testimony," it did "not find any of the identification procedures to be unduly suggestive."  Id. (internal citation omitted).

Finally, the court determined that the allegedly improper conversation between the court officer and the jurors was "merely ministerial."  The court further noted that Justice Goldberg had "conducted a thorough inquiry[] and carefully instructed the jurors at issue that [Epps] had no obligation to call witnesses, or any other burden of proof, and that such burden rested solely with the People."  Id.  For these reasons, the court concluded that Epps could not have been prejudiced by "the court officer's innocuous response concerning the order of proof," and that Justice Goldberg therefore "properly declined to declare a mistrial or replace the jurors at issue with alternates."  Id.

Epps sought leave to appeal the decision denying his direct appeal. (Resp't's Decl. Exs. E, F).  On May 8, 2008, however, Judge Carmen Ciparick of the Court of Appeals denied that application.  (Id. Ex. G).

F.      Habeas Petition

On April 23, 2009, Epps timely filed his Petition which asserts claims substantially the same as those raised as part of his direct appeal.  (ECF No. 2; see also ECF No. 8 ("Resp't's Mem.") at 21 (conceding timeliness)).  Thereafter, Epps filed a proposed amended petition asserting a Batson claim[4] and sought a stay so that he could exhaust that claim in state court.  (See ECF No. 5).  On September 24, 2009, Your Honor granted a stay contingent upon Epps demonstrating that his Batson claim was preserved at trial, which showing Epps subsequently made.  (See ECF Nos. 10, 14).

_____

[4]      See Batson v. Kentucky, 476 U.S. 79 (1986).

Epps apparently failed to take further action in state court, however, and on September 14, 2010, requested that the court proceed with his original Petition.  (ECF No. 18).  Thereafter, on September 21, 2010, the matter was referred to me for a Report and Recommendation.  (ECF No. 19).

II.    Discussion

    A.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

13

As the Second Circuit noted in Jones v. Stinson, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" 229 F.3d 112, 119 (2d Cir. 2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Jones, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

B.    Procedural Default

A federal habeas court generally is precluded from reviewing a petitioner's claim if the state court's prior denial of it rested on an adequate and independent state ground.  See, e.g., Cone v. Bell, 556 U.S. 449, 465 (2009); Harris v. Reed, 489 U.S. 255, 262 (1989).  A petitioner's failure to comply with a state procedural rule qualifies as such an adequate and independent state ground, provided that (1) the state court actually "relied on the procedural bar as an independent basis for its disposition of the case," Harris, 489 U.S. at 261-62 (internal quotation marks and citation omitted), and (2) the state procedural rule is "firmly established and regularly followed."  See Cotto v. Herbert, 331 F.3d 217, 239-40 (2d Cir. 2003) (internal quotation marks omitted).  A claim rejected in these circumstances is considered "procedurally defaulted."  Coleman v. Thompson, 501 U.S. 722, 731 (1991).

In determining whether to deny a habeas claim on the basis of a procedural default, federal courts "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'"  Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting Stinson, 229 F.3d at 118).  When the last state court to issue a reasoned decision relies on a state procedural bar, however, a court reviewing a habeas petition will presume

that subsequent decisions rejecting the claim without discussion relied on the bar and did not silently consider the merits.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Furthermore, even if the state court proceeds to consider the merits of the claim, its reliance on a procedural ground as one basis for the denial of the claim precludes habeas review.  Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

There is an exception permitting federal review of a procedurally defaulted claim when a petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously.  Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness.  See Carrier, 477 U.S. at 494-95.  Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent."  See Schlup v. Delo, 513 U.S. 298, 320 (1995); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).

In its decision, the Appellate Division entertained Epps' challenge regarding the lineup identifications, but held that his remaining claims concerning the

suggestiveness of the identification procedures were unpreserved.  Those claims

consequently are not cognizable on habeas review because the Appellate Division relied

on an independent and adequate state law ground to dismiss them, see Coleman, 501 U.S.

at 729, and the state law rule barring the review of unpreserved claims is "firmly

established and regularly followed" by New York courts, see Garcia, 188 F.3d at 77.

Epps also has failed to show that he falls within either of the narrow exceptions to the rule

precluding procedurally defaulted claims.

     C.    Exhaustion

        Epps' procedural default is not the only potential obstacle to habeas review.

To pursue his claims in this Court, Epps also must show that he has exhausted all of his

available state court remedies, or that there was an absence of state corrective process, or

that circumstances rendered that process ineffective to protect his rights.  See 28 U.S.C.

§ 2254(b)(1)(A)-(B).  As a defendant charged with crimes in New York State, Epps

unquestionably had an effective process available to him through the existing state

statutes governing appeals and collateral challenges in criminal cases.  See

CPL §§ 440.10 (motion to vacate judgment), 440.20 (motion to set aside sentence),

450.10 (direct appeal to Appellate Division as of right), 450.15 (discretionary appeal to

Appellate Division from denial of motion to vacate judgment), 450.90 (discretionary

appeal to Court of Appeals from adverse Appellate Division ruling).  Therefore, to satisfy

the exhaustion requirement with respect to a particular federal claim, Epps must show that

he "fairly present[ed]" his federal claims "in each appropriate state court (including a

state supreme court with powers of discretionary review)."  Baldwin v. Reese, 541 U.S.

27, 29-30 (2004).  In New York, those "appropriate" state courts are the Appellate

Division and the Court of Appeals.  Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005).

 A federal court may "deem" an otherwise unexhausted claim to be

exhausted if it would be procedurally barred in the state court to which a petitioner would

be required to present the claim.  Coleman, 501 U.S. at 735 n.1; Aparicio, 269 F.3d at 90.

In that circumstance, although the petitioner technically will have satisfied the exhaustion

requirement, he also will have procedurally defaulted his claim, thus preventing the

federal court from reaching the claim's merits, unless, once again, the petitioner can show

either cause for the default and resulting prejudice, or actual innocence.  See Sweet v.

Bennett, 353 F.3d 135, 139 (2d Cir. 2003).

 When faced with an unexhausted claim, a federal habeas court may, in

certain circumstances, order a stay to allow the petitioner to exhaust the claim in state

court.  See Rhines v. Weber, 544 U.S. 269, 277 (2005); Zarvela v. Artuz, 254 F.3d 374,

381-82 (2d Cir. 2001).  "[S]tay and abeyance is only appropriate when the district court

determines there was good cause for the petitioner's failure to exhaust his claims first in

state court.  Moreover, even if a petitioner had good cause for that failure, the district

court would abuse its discretion if it were to grant him a stay when his unexhausted

claims are plainly meritless."  Rhines, 544 U.S. at 277.  Federal courts thus have the

power to deny unexhausted claims on their merits.  28 U.S.C. § 2254(b)(2).

D.      Substantive Claims

1.      Suppression of Identification Evidence

a.      Unduly Suggestive Lineups

Epps has failed to demonstrate that his constitutional rights were violated as the result of an unduly suggestive lineup.  The Due Process Clause of the United States Constitution prohibits the introduction of identifications procured by means of "unduly suggestive" lineups, but "does not require that an accused be surrounded at a line-up by persons nearly identical in appearance." Love v. Kuhlman, No. 99 Civ. 11063 (DLC) (RLE), 2001 WL 1606759, at *7 (S.D.N.Y. Dec. 12, 2001) (citing United States v. Reid, 517 F.2d 953, 965 n.15 (2d Cir. 1975)); see also Espiritu v. Haponik, No. 05 Civ. 7057 (RJS), 2012 WL 161809, at *6 (S.D.N.Y. Jan. 19, 2012) ("Due process does not require total uniformity of appearance between the defendant and the other participants in the lineup") (internal quotation marks omitted); Roldan v. Artuz, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000) ("Police stations are not theatrical casting offices; a reasonable effort to harmonize the line-up is normally all that is required.") (internal quotation marks and citation omitted).  Thus, "even a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." United States v. Mohammed, 27 F.3d 815, 821 (2d Cir. 1994) (quoting United States v. Simmons, 923 F.2d 934, 950 (2d Cir. 1991)); see also Manson v. Brathwaite, 432 U.S. 98, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony . . . .").

19

To prevail on his lineup claim, Epps consequently must establish that the pretrial identification procedures were so suggestive that they created "a very substantial likelihood of irreparable misidentification." Mohammed, 27 F.3d at 821 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). The factors that a court must consider in determining the likelihood that the defendant was misidentified include "[(i)] the opportunity of the witness to view the criminal at the time of the crime, [(ii)] the witness' degree of attention, [(iii)] the accuracy of the witness' prior description of the criminal, [(iv)] the level of certainty demonstrated by the witness at the confrontation, and [(v)] the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972). "A good or poor rating with respect to any one of these factors will generally not be dispositive." United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992). Rather, "[i]n each case, the factors must be assessed in light of the totality of the circumstances." Id. at 378.

In this case, all of the Biggers factors weigh in favor of Justice Goldberg's decision not to suppress the lineup identification evidence. Both Lechner and Allen had an excellent opportunity to view Epps at the scene of the crime, since the hallway and lobby were well-lit and they apparently were able to view him attentively for several minutes. Moreover, the descriptions of Young's attacker that Lechner and Allen provided shortly after the incident accurately described Epps, and both confidently identified Epps at lineups conducted only a few months later. See Biggers, 409 U.S. at 199-200. There also was nothing unduly suggestive about the lineups. As the Appellate Division

20

accurately noted, at "each of the two lineups, the characteristics of the participants were reasonably similar and any differences were not sufficient to create a substantial likelihood that defendant would be singled out for identification." Epps, 851 at 507; (see also Resp't's Decl. Exs. H, I (photographs showing that the fillers were similar to Epps in age, size, and general appearance)).

Epps consequently has failed to demonstrate, as he must, that the lineup procedures in this case were so suggestive that they created "a very substantial likelihood of irreparable misidentification." Mohammed, 27 F.3d at 821 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). Epps' claim that the lineups were unduly suggestive therefore should be rejected.

   b.   Other Suppression Claims

As noted previously, Epps' remaining claims concerning the pretrial identifications are unpreserved and hence unreviewable. In any event, even if that were not so, those claims fail on the merits. At the outset, there is no indication that the fact that Lechner and Allen viewed photographs of potential subjects together in any way prejudiced Epps, nor has Epps proffered any evidence that Allen's identification of him was somehow tainted by her prior conversations with Lechner. Epps also could not have been prejudiced by the clothing he wore during the lineups because all of the lineup participants wore sweaters, sweatshirts or light jackets, (see Resp't's Decl. Exs. H, I); Young's attacker, on the other hand, wore a heavy, long coat, (see, e.g., T1. 312).

Epps also has failed to establish that his constitutional rights were violated simply because Lechner viewed a photo of Epps in an array prior to viewing him in the lineup.  In Simmons, the Supreme Court acknowledged that an identification at a lineup may be less reliable if the witness previously viewed the suspect in a photograph, but went on to note that:

> Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. . . .  We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement.

390 U.S. at 384.  The Court concluded that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Id.  Here, the fact that Lechner viewed a five-year-old photograph of Epps in one of four photo arrays, which were among hundreds of photographs that he examined prior to identifying Epps in the lineup and at trial, falls far short of establishing the substantial likelihood of a misidentification necessary to warrant habeas relief.

For these reasons, even if the Court were to reach the merits, Epps' additional claims relating to the suppression of evidence would have to be denied.

2.      Court Officer's Communication with Jurors

Epps' claim that his constitutional rights were violated by inappropriate communications between a court officer and several jurors is similarly meritless. Whether a juror is capable of rendering an impartial decision is, of course, a question of fact.  Accordingly, on habeas review, the state court's factual determinations must be presumed to be correct unless a petitioner demonstrates otherwise by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see Wainwright v. Witt, 469 U.S. 412, 429 (1985).  Moreover, "[a]bsent evidence to the contrary, [courts] presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court."  United States v. Rosario, 111 F.3d 293, 300 (2d Cir. 1997) (quotation marks omitted; brackets in original).

In this case, Justice Goldberg correctly concluded that the conversation between the court officer and the jurors was entirely innocuous and in no way prejudiced Epps.  Furthermore, Justice Goldberg thoroughly questioned the court officer and all three jurors regarding the conversation and reiterated to the jurors that Epps was not required to put on a case.  The jurors also each indicated that they understood that instruction, which became irrelevant as the trial progressed since Epps did present a defense case.  Epps has not proffered any evidence – much less clear and convincing evidence – that the jurors were rendered incapable of being impartial as a result of their brief conversation with the court officer.  Epps' claim relating to Judge Goldberg's denial of his motion for a mistrial consequently does not afford a basis for habeas relief.

23

3.      Conviction Against the Weight of the Evidence

Epps' claim that his conviction was against the weight of the evidence also

should be denied.  "A challenge to a verdict based on the <u>weight</u> of the evidence is

different from a challenge based on the <u>sufficiency</u> of the evidence; both state and federal

courts in New York have recognized that an argument based on the 'weight of the

evidence' is purely a state law claim grounded in New York Criminal Procedure Law

§ 470.15(5), whereas a legal sufficiency claim is based on federal due process principles."

<u>Minigan v. Donnelly</u>, 01-CV-0026A (VEB), 2007 WL 542137, at *13 (W.D.N.Y. Feb.

16, 2007) (emphasis in original), <u>report and recommendation adopted</u>, 01-CV-026, 2007

WL 981762 (W.D.N.Y. Mar. 30, 2007) (citing <u>People v. Bleakley</u>, 69 N.Y.2d 490, 495

(1987)).  Because habeas review is not available to remedy alleged errors of state law, <u>see</u>

28 U.S.C. § 2254(a), "courts in this Circuit consistently have held that

weight-of-the-evidence claims are not cognizable on federal habeas review since such

claims allege only an error of state law, for which habeas review is not available."

<u>Minigan</u>, 2007 WL 542137, at *13 (citing <u>Garrett v. Perlman</u>, 438 F. Supp. 2d 467, 470

(S.D.N.Y. 2006); <u>Douglas v. Portuondo</u>, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002);

<u>Correa v. Duncan</u>, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); and <u>Soundiata v. Artus</u>,

No. 04 Civ. 1412 (DAB) (KNF), 2007 WL 143061, at *5 (S.D.N.Y. Jan.12, 2007)).

Moreover, even if Epps' claim were construed as a sufficiency of the

evidence claim, and that claim had been exhausted, Epps would be entitled to no relief.

At trial, three credible eyewitnesses – Young, Lechner, and Allen – testified that Epps

24

was the person who attacked Young and stole her purse.  Moreover, their testimony was corroborated by other evidence, including the fact that Epps lived in the building to which the assailant fled (in an apartment near where Sergeant Miranda lost track of him), and sported gold caps on his teeth.  In light of this testimony and other evidence, there can be no serious argument that the evidence of Epps' guilt was legally insufficient.

III.    Conclusion

For the foregoing reasons, the Petition should be denied.  Furthermore, because Epps has not made the substantial showing of the denial of a constitutional right required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not issue.

IV.   Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard Owen, United States District Judge, and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Owen.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

SO ORDERED.

Dated:      New York, New York
            May 17, 2013

                                              FRANK MAAS
                                    United States Magistrate Judge

26

Copies to:

Hon. Richard Owen
United States District Judge

William Epps (by United States Mail)
DIN# 05-A-2292
Green Haven Correctional Facility
P.O.Box 4000
Stormville, New York 12582

Lea L. La Ferlita (by ECF)
Assistant Attorney General
120 Broadway
New York, New York 10271